IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:08-CV-00292-FL

| | | |
|---|---|---|
| LAWRENCE EVERETTE PHIFER, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM & RECOMMENDATION |
| | ) | |
| CITY OF ROCKY MOUNT; | ) | |
| JOHN MANLEY, CHIEF OF POLICE. | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the motions for summary judgment by Defendants John Manley [DE-21] and the City of Rocky Mount [DE-27]. Plaintiff Lawrence Everette Phifer, Jr. ("Phifer") has responded to both motions. [DE-31 & 32]. Therefore, these matters are ripe for adjudication.

## STATEMENT OF THE CASE

The Rocky Mount Police Department employed Phifer as a certified law enforcement officer. Fahnestock Aff. ¶¶ 6, 9 [DE-24]. He allegedly was retaliated against while on the job for complaining about an affair between Defendant John Manley, the police chief, and a fellow officer. Compl. ¶¶ 50-56 [DE-1]. He filed a formal administrative complaint with the Equal Employment Opportunity Commission ("EEOC") and a Notice of Right to Sue letter was mailed to him on April 10, 2008. Rocky Mount Mem., Ex. H at 8 [DE-28, Attach. No. 8]. He filed a complaint in this Court on July 2, 2008, asserting against both defendants claims of defamation/libel per se, defamation/slander per se, intentional or reckless infliction of severe emotional distress, and wrongful/intentional interference with prospective advantage. Compl. ¶¶

1

21-49 [DE-1]. Phifer also asserted claims of employment discrimination and/or retaliation against the City of Rocky Mount, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. Compl. ¶¶ 50-56 [DE-1]. Defendant Manley filed his motion for summary judgment on December 11, 2009 [DE-21], and the City of Rocky Mount filed its motion for summary judgment on December 15, 2009 [DE-27].

## STATEMENT OF THE FACTS

Phifer began working for the City of Rocky Mount on November 20, 2006. Henderson Aff. ¶ 4, Rocky Mount Mem. Ex. B [DE-28, Attach. No. 2]. When Phifer started working, the North Carolina Criminal Justice Education and Training Standards Commission had not yet certified him as a police officer, so he was assigned to the administrative unit of the City of Rocky Mount Police Department. Id. On February 20, 2007, he was certified and began working as a police officer in the patrol division. Id. ¶ 5; Fahnestock Aff. ¶ 9 [DE-24]. In May 2007, Phifer was assigned to a shift under the command of Lieutenant Tim Mehus. Mehus Aff. ¶ 6 [DE-25].

During his time employed with the City of Rocky Mount Police Department, Phifer had numerous run-ins with various members of the Department, the details of which are contested. According to Captain Laura Fahnestock, who works for the Rocky Mount Police Department, on July 16, 2007, she was driving to work in her personal vehicle and saw Phifer speed past her in his patrol car and then run through a red light without stopping or slowing down. Fahnestock Aff. ¶ 10 [DE-24]. Captain Fahnestock told Lieutenant Mehus about Phifer's driving and directed Lieutenant Mehus to issue an oral reprimand, which he did. Id. ¶ 11. Lieutenant Mehus also issued corrective counseling to Phifer because Lieutenant Mehus thought that Phifer had

2

been disrespectful to him during a shift change. Mehus Aff. ¶ 9 [DE-25]. Phifer denies that he was disrespectful to Lieutenant Mehus. Phifer Depo. at 91:16-24 [DE-33, Attach. No. 3].

At the end of July 2007, Phifer wanted to change shifts. Phifer's Mem. Ex. 3 at 1 [DE-33, Attach. No. 2]. Lieutenant Mehus told Phifer that he needed to write down the request and present it to Captain Fahnestock, which Phifer did. Id. On August 2, 2007, Phifer attended a meeting with Captain Fahnestock and Lieutenant Mehus regarding his requested change. Id. He told them that he was having some communication issues with Lieutenant Mehus, that he needed to take his wife to chemotherapy sessions because she had been diagnosed with cancer and that he and his wife were taking classes so that they could adopt a child, which conflicted with his shift time. Id.; Phifer Depo. at 101:18-105:21 [DE-33]. At the time of his request, Phifer was aware that another officer was granted a shift change because he had babysitting conflicts. Phifer Depo. at 115:19-116:1 [DE-33]. Phifer's request was denied. Id. at 102:11.

According to Lieutenant Mehus and Captain Fahnestock, at the August 2 meeting, Phifer stated that he needed to transfer shifts because his wife had cancer and he needed to take her to chemotherapy appointments. Mehus Aff. ¶ 14 [DE-25];Fahnestock Aff. ¶ 14 [DE-24]. When asked for further details, however, Phifer said that his wife had not yet been to the doctor, had not been diagnosed with cancer and did not have a treatment schedule. Mehus Aff. ¶ 14 [DE-25]; Fahnestock Aff. ¶ 16 [DE-24]. Captain Fahnestock said that she told Phifer that he should put his request to transfer in writing along with information regarding his wife's medical condition as it developed, but he never mentioned the shift change request or his wife's condition again. Fahnestock Aff. ¶¶ 17-18.

In August 2007, the City of Rocky Mount Police Department was hiring cadets. Phifer recommended to Chief John Manley that he hire Phifer's neighbor, Shirley Moore. Moore Aff. ¶

3

3 [DE-33]. She was hired on August 29, 2007. Id. ¶ 5. Cadet Moore stated that early in her employment Chief Manley made it clear that he possessed the authority and power to impact a cadet's employment and career. Id. ¶ 6. Cadet Moore stated that from September through December 2007, Chief Manley pursued her by continually asking her out to lunch and dinner, calling her on the phone, instructing her to meet him at private places and insisting that she have sex with him. Id. ¶ 9. Cadet Moore told Phifer that she was having sex with Chief Manley. Phifer Depo. at 74: 21-75:17 [DE-33]. In September 2007, Cadet Moore stated that Chief Manley was pressuring her to have lunch with him and she declined; Phifer heard the exchange and told Chief Manley to "back off." Moore Aff. ¶ 8 [DE-33]. In addition, Phifer stated that he told Chief Manley that if he had known Chief Manley was going to try and take advantage of Cadet Moore, he would not have recommended her to the Department. Id.; Phifer Depo. at 70:8-18 [DE-33].

Phifer stated that at some point Cadet Moore told him that she was pregnant. Phifer Depo. at 75:21-76:7 [DE-33]. Phifer felt that Chief Manley was "taking advantage of . . . somebody eager to get into law enforcement." Id. at 76:13-15. Cadet Moore stated Chief Manley said "we're going to have to do something about this," when she told him about the pregnancy and gave her money for an abortion. Moore Aff. ¶ 12 [DE-33]. In December 2007, Cadet Moore stated that Chief Manley was very upset because he said that Phifer had sent an anonymous letter to his wife telling her about their affair. Id. ¶ 16. Cadet Moore further stated that Chief Manley said he would get even with Phifer. Id. ¶ 18. Chief Manley denies ever having a sexual relationship with Cadet Moore or interacting with her in any way other than in a professional capacity. Manley Aff. ¶ 30 [DE-23].

4

On October 8, 2007, Captain Fahnestock issued an oral reprimand to Phifer due to an accident and request for assistance made by Phifer a week earlier. Fahnestock Aff. ¶ 19 [DE-24]. Phifer said that he went into a building in response to a call after hearing that his backup had arrived on the scene. Phifer Depo. at 141:7-13 [DE-33]. Phifer was involved in an altercation with an individual and requested help. Id. In fact, the backup was not on scene, and got into a car accident rushing to Phifer's location. Id. Phifer received a reprimand for the incident, but the officer who got into the car accident did not. Id.

At some point during Phifer's tenure with the Rocky Mount Police Department Lieutenant Mehus pulled Phifer aside at the end of his shift and said "[y]ou're not going to ride that forever. I'm going to get you." Id. at 89:13-14. He said this to Phifer while no one else was around. Id. at 89:20. In addition, at some point Lieutenant Mehus told Phifer that he and Chief Manley were "on the same page." Id. at 121:2-7. Phifer believed that Lieutenant Mehus was always trying to find something wrong with what he did, which made the work environment very stressful and uncomfortable. Id. at 89:19-91:2.

On November 10, 2007, Corporal Matthew Edwards worked on the same shift as Phifer. Edwards Aff. ¶ 5 [DE-26]. On November 12, 2007, Corporal Edwards reported to Lieutenant Mehus that he had seen Phifer driving unsafely during their November 10 shift. Id. ¶¶ 5, 6, & 11. He told Lieutenant Mehus that while responding to a call, Phifer had driven in the oncoming traffic lanes and suddenly turned left in front of Corporal Edwards, requiring Corporal Edwards to slam on his breaks in order to avoid an accident. Id. ¶ 7. In addition, Corporal Edwards stated that Phifer had used his blue lights when responding to a call for property damage, which was unnecessary. Id. ¶ 8. Finally, Corporal Edwards stated that later that night, he was parked at the Piggly Wiggly grocery store in Rocky Mount when he heard a car revving its engine loudly as it

5

approached his location. Id. ¶ 9. He thought that the car was likely speeding, and could have been going as high as 80 miles per hour in a 35 mile per hour zone. Id. Corporal Edwards was preparing to stop the car as soon as it passed him, however when the car drove by, he saw that it was a police car and that Phifer was driving. Id. Phifer stated that he did not see Corporal Edwards when he allegedly cut him off by making a left turn, and that multiple units were responding to the call. Phifer Depo. at 137:20-138:14. In addition, Phifer denies speeding in front of the Piggly Wiggly grocery store on Raleigh Road. Id. at 138:23-139:2. He stated that there was construction on Raleigh Road, and so he could not have been speeding. Phifer Depo. at 121:12-14 [DE-28]. Lieutenant Mehus issued a reprimand to Phifer for unsafe driving based on these incidents. Rocky Mount Mem. Ex. D [DE-23, Attach. No. 4].

On November 12, 2007, Lieutenant Mehus met with Phifer regarding Phifer's attitude based on the way that Phifer addressed him over the radio. Mehus Aff. ¶ 16 [DE 25]. Lieutenant Mehus explained his concerns and expectations to Phifer. Id. Phifer asserts that he was reprimanded for saying "that's fine" on the radio after Lieutenant Mehus told him not to respond to a fight in progress. Phifer Depo. at 91:16-21 [DE-33]. Phifer stated that officers responded "that's fine" on the radio frequently, but he was singled out and reprimanded. Id.

On November 13, 2007, Lieutenant Mehus received a complaint from Sergeant Scott Pair of the Nash County Sheriff's Department that he had observed a Rocky Mount Police Officer driving at 105 miles per hour in a 65 mile per hour zone on Highway 64 in a patrol car with a "Vista" light bar. Id. ¶ 17. Lieutenant Mehus checked the record logs, and concluded that Phifer was the only officer in that part of Nash County in a marked police car at that time; Phifer had been transporting a prisoner to the detention center. Id. Lieutenant Mehus asked Phifer how he had traveled to the detention center. Id. ¶ 18. Phifer stated that he traveled on Sunset Boulevard

6

and not on Highway 64, and that he had stopped at a Shell Station and purchased a bottle of water from a female clerk. Id.

Lieutenant Mehus checked out Phifer's story by going to the Shell Station. Id. ¶ 19. The clerk who had been on duty during the night in question told Lieutenant Mehus that no police officer had been in to buy water, no female clerk had been on duty, and that a surveillance camera captures vehicles driving on Sunset Avenue. Id. ¶¶ 19-20. Lieutenant Mehus reviewed the surveillance tapes, which did not show a Rocky Mount Police car driving on the road during the relevant time period. Id. ¶ 20.

On November 14, 2007, Lieutenant Mehus talked to Phifer about his visit to the Shell Station and review of the surveillance tapes. Id. ¶ 22. Phifer said that he had made a mistake and had stopped at a different convenience store, known as Valeros. Id. According to Phifer, at this meeting, Lieutenant Mehus cursed at him and told him to "shut [his] damn mouth," said he was a liar, and said that he would be fired and his certification taken. Phifer Depo. at 139:15-140:11 [DE-33].

After the meeting, Lieutenant Mehus went to Veleros and talked to the store manager and the clerk who was working on the date in question. Mehus Aff. ¶ 22 [DE-25]. The clerk stated that he had not seen a Rocky Mount Police Officer come into the store that night, but that several days later, an officer had come in and told the clerk that he had bought a bottle of water "last week." Id.

Lieutenant Mehus sustained the allegations against Phifer for reckless driving. Id. ¶ 23. Phifer maintains that he was falsely accused of speeding on Highway 64. Phifer Depo. at 124:19-24 [DE-33]. Each patrol vehicle has a number marked on the side, but Sergeant Pair did not identify the number on the vehicle or the license plate number. Id. at 125:1-8.

7

Around November 14, 2007, Chief Manley, who was out of town, received a telephone call advising him that Phifer was upset, and was having conflicts with Lieutenant Mehus. Manley Aff. ¶ 5 [DE-23]. Chief Manley called Phifer and left him messages. Id. ¶ 6. Phifer called Chief Manley back on November 15, 2007, and told him that his wife had cancer, that he was thinking of resigning and wanted to transfer shifts, but that Lieutenant Mehus and Captain Fahnestock had denied his request to change shifts despite his wife's cancer. Id. ¶ 7. Phifer also told Chief Manley that the work environment was becoming intolerable and that Lieutenant Mehus was "harassing him." Id. ¶ 8; Phifer Depo. at 100:6-101:12 [DE-33]. Chief Manley told Phifer to put his concerns in writing and he would review them when he returned. Manley Aff. ¶ 9 [DE-23].

Phifer wrote a letter dated November 16, 2007, to Chief Manley complaining about the harassment that he felt he was facing from Lieutenant Mehus and the fact that his transfer request had been denied. Phifer's Mem., Ex. 3 [DE-33, Attach. No. 2]. In addition, Phifer wrote a letter of resignation dated November 16, 2007, to Chief Manley to become effective two weeks later, on December 4, 2007. Id., Ex. 8 [DE-33, Attach. No. 2]. In the resignation letter, he stated, "I really want to thank you for standing by me when no one else would." Id. When Chief Manley returned to his office on November 17, 2007, he reviewed these letters. Manley Aff. ¶ 10 [DE-23]. On November 18, 2007, Chief Manley called Phifer and told him not to report for work that day, and Chief Manley told Phifer that he was transferring Phifer to the day shift while Chief Manley reviewed Phifer's complaints. Id. ¶ 11. Phifer declined the shift change because he was not interested in moving to the day shift, rather he had wanted a different night shift that would have worked better for his wife's treatment schedule. Phifer Depo. at 100:20-101:5 [DE-33].

On November 19, 2007, Chief Manley received an investigative package concerning (1) the claim that Phifer was traveling 105 mile per hour on Highway 64 and (2) the internal affairs report by Corporal Edwards that Phifer had been speeding at approximately 80 miles per hour in front of the Piggly Wiggly Grocery Store. Manley Aff. ¶ 12 [DE-23]. He set a meeting with Phifer for November 21, 2007, to discuss the speeding allegations and Phifer's claim of harassment. Id.

Chief Manley, Captain Fahnestock, Lieutenant Mehus, and Phifer attended the November 21, 2007 meeting. Manley Aff. ¶¶ 13-14 [DE-23]; Fahnestock Aff. ¶ 22 [DE-24]; Mehus Aff. ¶ 31 [DE-25]. At the meeting, Chief Manley asked Phifer if he wanted to rescind his resignation but Phifer declined. Manley Aff. ¶ 14 [DE-23]. Phifer stated that Lieutenant Mehus had used profanity towards him during a meeting discussing the allegations of Phifer's speeding. Id. Lieutenant Mehus denied that he cursed at Phifer, but noted that he had recently learned that another officer that was present had tape recorded his conversation with Phifer. Manley Aff. ¶ 14 [DE-23]; Mehus Aff. ¶ 30 [DE-25]. Chief Manley told Captain Fahnestock to undertake an internal affairs investigation into whether Lieutenant Mehus had cursed at Phifer. Manley Aff. ¶ 14 [DE-23]. Chief Manley asked Phifer about the allegations of speeding on Highway 64, and Phifer denied that he had driven on the Highway 64 and that he had been speeding. Id. ¶ 15. During the meeting, Chief Manley also asked Captain Fahnestock about Phifer's claim that she had denied his request for a transfer even though he needed to change his work schedule due to the fact that his wife had cancer and needed treatments. Id. ¶ 16. Captain Fahnestock denied that Phifer had needed a transfer due to his wife's cancer because Phifer had said that his wife had not even been to the doctor. Id.

9

After hearing from Phifer, Captain Fahnestock, Lieutenant Mehus and reviewing the internal affairs investigations regarding Phifer's alleged speeding, Captain Manley told Phifer that it would not be necessary for him to work the additional two weeks, that his resignation was effective immediately, and that he should turn in his badge and gun, which Phifer did. Id. ¶ 17.

After the meeting, Captain Fahnestock listened to the tape recording of Phifer's conversation with Lieutenant Mehus regarding the speeding allegation. Fahnestock Aff. ¶ 20 [DE-24]. She concluded that Lieutenant Mehus had said "Phifer, Phifer, Phifer; Shut your mouth," but had not used profanity. Manley Aff. Ex. E at 5 [DE-23, Attach. No. 5]. Phifer was charged with a violation of the policy on truthfulness and Lieutenant Mehus was cleared of the allegation that he used profanity. Fahnestock Aff. ¶ 20 [DE-24]; Manley Aff. ¶ 14 & Ex. E [DE-23, Attach. No. 5];.

Phifer had applied for and obtained a job with the Town of Freemont Police Department before his resignation from the City of Rocky Mount Police Department. Phifer Depo. at 47:22-48:18 [DE-22]. He started working for the Town of Freemont the next business day after leaving the employ of the City of Rocky Mount. Id. at 13:7-13.

Phifer applied for a job with the police department for the Town of La Grange, North Carolina after he left the employment of the City of Rocky Mount and had begun working for the Town of Freemont. Id. at 52:22-53:24. As part of the employment vetting process, officers from the Town of La Grange contacted Chief Manley regarding Phifer and provided Chief Manley with a release authorization signed by Phifer. Manley Depo. ¶ 24-25 [DE-23]. The officers asked Chief Manley about his impressions of Phifer, and Chief Manley told the officers that he was concerned about Phifer's truthfulness and integrity. Id. ¶ 26. Phifer was not hired for the Town of La Grange position. Phifer's Mem., Ex. 11 [DE-33, Attach. No. 2].

## DISCUSSION

### I.  Standard of Review

A court should grant a summary judgment motion pursuant to Rule 56 of the Federal Rules of Civil Procedure when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating absence of a genuine issue of material fact. Celotex Corop. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). As this Court has stated, summary judgment is not a vehicle for the court to resolve disputed factual issues. Faircloth v. United States, 837 F. Supp. 123, 125 (E.D.N.C. 1993). Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249.

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. Faircloth, 837 F. Supp. at 125.

### II.  Manley's Motion for Summary Judgment [DE-21]

In his complaint, Phifer asserts numerous state law claims against Defendant Chief Manley, including defamation, intentional infliction of emotional distress, and interference with a prospective contract. [DE-1]. Chief Manley filed the current motion for summary judgment with regard to all claims against him. [DE-21].

A. Official or Personal Capacity Claims

First, Chief Manley argues that Phifer asserted claims against him in his official capacity, not in his personal capacity, and as such they should be dismissed as duplicative of the claims made against the City of Rocky Mount. Manley's Mem. at 9-11. The Complaint does not specify whether the claims made are against Chief Manley in his official or personal capacity.

The North Carolina Supreme Court has described the difference between individual and official capacity suits as follows: when suing a defendant in his individual capacity, the plaintiff is seeking recovery from the defendant directly but a when suing a defendant in his official capacity, the plaintiff is seeking recovery from the government agency employing the defendant. Meyer v. Walls, 489 S.E.2d 880, 887 (N.C. 1997). The Court has further clarified how to determine the capacity in which a defendant has been sued:

> The crucial question for determining whether a defendant is sued in an individual or official capacity is the nature of the relief sought, not the nature of the act or omission alleged. If the plaintiff seeks an injunction requiring the defendant to take an action involving the exercise of a governmental power, the defendant is named in an official capacity. If money damages are sought, the court must ascertain whether the complaint indicates that the damages are sought from the government or from the pocket of the individual defendant. If the former, it is an official-capacity claim; if the latter, it is an individual capacity claim; and if it is both, then the claims proceed in both capacities.

Id. at 887.

Here, Phifer requests a declaratory judgment and injunctive relief in his Complaint. Compl. ¶¶ 57-58 [DE-1]. In addition, he requests "economic damages according to proof, together with lawful interest." Id. ¶ 59.

The fact that Phifer has requested an injunction, which requires governmental power, suggests that Chief Manley is being sued in his official capacity. Because Phifer has requested monetary relief, the Court must determine from whom the damages are sought, as the Complaint does not specify. Mullis v. Sechrest, 495 S.E.2d 721, 723-24 (N.C. 1998). To make this determination, a court must review the allegations in the complaint and the course of proceedings. Id. at 724.

The caption of the Complaint does not directly specify whether Chief Manley is being sued individually or officially. "[I]n the absence of a clear statement of defendant's capacity, a plaintiff is deemed to have sued a defendant in his official capacity." Reid v. Town of Madison, 527 S.E.2d 87, 90 (N.C. 2000). In addition, the Complaint does not set forth claims for relief against Chief Manley separately, but instead states claims collectively against Chief Manley and the City of Rocky Mount; this indicates an intention to sue Chief Manley in his official capacity. Oakwood Acceptance Corp., LLC v. Massengill, 590 S.E.2d 412, 421 (N.C. Ct. App. 2004). Finally, the North Carolina Supreme Court in Mullis reviewed the course of proceedings, noting that even after the defendants asserted a defense of government immunity, the plaintiffs did not attempt to amend their complaint to specify the capacity in which they were suing the individual defendant. Mullis, 495 S.E.2d at 724. The same is true here. Chief Manley answered the Complaint asserting claims of sovereign, public official and qualified immunity. Manley's Answer at 1 [DE-11]. However Phifer never made an attempt to amend the Complaint to assert claims against Manley in his personal capacity.

Phifer does refer throughout the Complaint to "Chief Manley," and not "Chief of Police of Rocky Mount" or "Agent of Rocky Mount" or some other title of office, which provides some support for an individual capacity suit. See Oakwood Acceptance Corp., 590 S.E.2d at 210 (noting that a complaint that refers to a defendant by a title and not by the individual's given name supported a conclusion by the court that the defendant was sued in his official capacity). However, it is the Court's opinion that Phifer's reference to Defendant Manley as "Chief Manley" and his prayer for money damages are not sufficient to support a conclusion that he sued Defendant Manley in his personal capacity. Based on a review of the pleadings and the course of proceedings, it is the Court's opinion that Phifer asserted claims against Chief Manley only in his official capacity.

An official capacity suit is "merely another way of pleading an action against the governmental entity." Mullis, 495 S.E.2d at 725. Therefore, where a plaintiff has sued the government agency for money damages, "a suit naming public officers in their official capacity is redundant." Moore v. City of Creedmoor, 481 S.E.2d 14, 21 (N.C. 1997). As a result, Phifer's claims against Chief Manley in his official capacity as Chief of the Rocky Mount Police Department are identical to his claims against the City of Rocky Mount. Accordingly, summary judgment should be granted with respect to those claims. Wright v. Town of Zebulon, 688 S.E.2d 786, 789 (N.C. Ct. App. 2010) (affirming the dismissal of official-capacity claims asserted against individuals where those claims were also asserted against their employer, the Town of Zebulon). Alternatively, the Court finds, as discussed below, that Manley is entitled to summary judgment on the merits of each claim.

B. Defamation Claim

Phifer asserted the claims of "defamation: liable per se" and "defamation: slander per se" in his Complaint against Chief Manley and the City of Rocky Mount. Compl. ¶¶21-36 [DE-1]. Specifically, Phifer argued that Chief Manley's statements in the Form F5-B Report of Separation of Law Enforcement Officer to the Criminal Justice Education and Training Standards Commission of the North Carolina Department of Justice were false and defamatory. Id. ¶ 22. Chief Manley wrote that Phifer had "issues of integrity, all documented in personnel files. Behaviors/conduct in conflict with our policies and departmental core values." Manley Aff. Ex. G [DE-23, Attach. No. 7]. In addition, Phifer asserted that Chief Manley made statements to officers of the the La Grange Police Department who were vetting Phifer for a job. Compl. ¶ 30 [DE-1]. Chief Manley told the La Grange Police Officers that he had concerns about Phifer's truthfulness and integrity. Manley Aff. ¶ 26 [DE-23].

As an initial matter, Chief Manley contends he is protected by a qualified privilege for the statements he made. In order to establish that a party is entitled to protection under a qualified privilege he must show "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion and publication in a proper manner and to proper parties only." Harris v. Procter & Gamble Mfg. Co., 401 S.E.2d 849, 850 (N.C. Ct. App. 1991). Chief Manley, as the head of a law enforcement agency, was required to fill out the F-5B form for Phifer. Manley Aff. ¶ 21 [DE-23]. In addition, he was contacted by the officers from the La Grange Police Department and asked to give his impression of Phifer. Id. ¶ 25. However, a question remains as to whether he made the statements about Phifer in good faith, or whether he made the statements in order to get back at Phifer for complaining about the alleged relationship between Chief Manley and Cadet Moore.

15

Chief Manley asserts that the case of <u>Spencer v. Byrd</u>, 917 F. Supp. 368 (M.D.N.C. 1995), is similar to the one at hand. In Spencer, a police chief was also sued for defamation for statements that he made in an F5-B report. In a bench trial, the court found that the police chief was protected by a qualified privilege. However, and tellingly, in <u>Spencer</u>, summary judgment was denied on the defamation claim and it was adjudicated at trial. Because there is a question of fact as to whether Chief Manley made the statements about Phifer in good faith or in retaliation, he is not entitled to a qualified privilege at this stage in the proceeding. Notwithstanding, the Court still must consider whether Manley is entitled to summary on the merits of the defamation claim itself.

In order to prevail on a claim of defamation, "a plaintiff must allege that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." <u>Boyce & Isley, PLLC v. Cooper</u>, 568 S.E.2d 893, 897 (N.C. Ct. App. 2002). The term "defamation" encompasses two different torts, that of libel and slander. <u>Id.</u> Libel per se is the publication of an obviously false statement that impeaches the plaintiff in his profession. <u>Arnold v. Sharpe</u>, 251 S.E.2d 452, 455 (N.C. 1979). Slander per se is an untrue oral communication that clearly damages the plaintiff's professional reputation. <u>Badame v. Lampke</u>, 89 S.E.2d 466, 468 (N.C. 1955).

The standard of proof in defamation cases differs based on whether the alleged defamatory statements are made regarding a public or private figure. In defamation actions brought by public officials, the plaintiff must prove that the defendant published a defamatory statement with actual malice. <u>New York Times v. Sullivan</u>, 376 U.S. 254, 279-80 (1964). Actual malice is established when a defamation plaintiff who is a public official or public figure establishes by "clear and convincing proof that the defamatory falsehood was made with

knowledge of its falsity or with reckless disregard for the truth[.]" Gaunt v. Pittaway, 534 S.E.2d 660, 665 (N.C. Ct. App. 2000) (internal quotations omitted). However, in cases where the plaintiff is a private figure, and the speech at issue is of private concern, a plaintiff need not surmount such a high barrier to recover damages. Neill Grading & Constr. Co. v. Lingafelt, 606 S.E.2d 734, 738 (N.C. Ct. App. 2005). Phifer, as a police officer with the Rocky Mount Police Department, is a public official for purposes of defamation claims. See Dellinger v. Belk, 238 S.E.2d 788, 789 (N.C. Ct. App. 1977) (concluding that police officer was public official for purpose of evaluating defamation claim). This is so even though the allegedly defamatory statements were made after Phifer resigned. See Varner v. Bryan, 440 S.E.2d 295, 299 (N.C. Ct. App. 1994) (concluding "extension of 'public official' status beyond the duration of an official's employment is consistent with the New York Times policy favoring robust and open debate of public issues.").

"[W]here the factual dispute concerns actual malice, . . . the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56 (1986). Whether the evidence presented in a defamation case is sufficient to support a finding of actual malice is a question of law. Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 685 (1989).

Phifer argues that his evidentiary burden is satisfied because Chief Manley made the statements maligning his integrity and honesty when he knew that they were false. The question for the Court then, is to determine whether Phifer has provided clear and convincing evidence that Chief Manley knew the statements were false, or made the statements with reckless disregard of whether they were false, such that a jury could find that he acted with actual malice.

17

Phifer argues that Chief Manley made those statements knowing they were false because Phifer opposed the alleged sexual relationship between Chief Manley and Cadet Moore. Phifer Opp'n at 13-14 [DE-31]. In support of this contention, Phifer provided an affidavit from Cadet Moore, in which she stated that Chief Manley told her that he would "soon get even with Phifer" and that Phifer "won't be working in law enforcement after I'm through with him" after Chief Moore thought that Phifer sent a letter to his wife exposing the alleged affair. Moore Aff. ¶ 18 [DE-33]. In addition, Phifer testified at his deposition that he thought that Lieutenant Mehus was targeting him at the direction of Chief Manley. Phifer Depo. at 133:19-135:5 [DE-33]. Chief Manley avowed that he made the statements at issue because he believed them to be true, based on the various internal investigative reports of Phifer's wrongdoing and discussions with Lieutenant Mehus and Captain Fahnestock. Manley Aff. ¶¶ 20-28 [DE-23].

Taking Phifer's allegations as true, as the Court must in this summary judgment motion, Phifer was targeted by Lietuenant Mehus and reprimanded for actions that he did not do. However, Phifer was also accused of speeding by Captain Fahnestock and Corporal Edwards, two individuals whom Phifer did not claim were acting on Chief Manley's orders to target him. Captain Fahnestock stated that she saw Phifer speeding on her way to work, Fahnestock Aff. ¶ 10 [DE-24], and Corporal Edwards said he saw Phifer speeding on Raleigh road, Edwards Aff. ¶ 9 [DE-26]. In addition, Chief Manley had Captain Fahnestock investigate Phifer's allegations that Lieutenant Mehus cursed at him during a conversation regarding his alleged speeding on Highway 64. Fahnestock Aff. ¶ 20 [DE-24]. During the course of her investigation, she found out that Sergeant Silvio Jacob had been present during the conversation between Phifer and Lieutenant Mehus and had recorded it. Id. She reviewed the recording and found that no profanity had been used, accordingly Phifer was charged with a violation of the policy on

18

truthfulness. Therefore, even if the allegations made by Lieutenant Mehus were all false with regard to Phifer, statements by other police officers raised questions regarding Phifer's conduct and the audio recording raised questions regarding Phifer's honesty, which would support the veracity of Manley's statements.

Additionally, assuming Phifer's version of events is true, Chief Manley harbored personal hostility and ill will toward Phifer. However, evidence of personal hostility, animosity and ill will does not constitute evidence of "actual malice," as required for a defamation claim against a public official to survive. Varner, 440 S.E.2d at 300. The Court concludes that there is insufficient evidence in the record to support a reasonable jury finding that the plaintiff has shown actual malice by clear and convincing evidence. Accordingly, it is the Court's opinion that Phifer failed to raise a genuine issue of material fact with regard to the alleged defamatory statements made by Chief Manley.


C.  Intentional Infliction of Emotional Distress Claim

Phifer also alleged a claim for intentional infliction of emotional distress. Compl. ¶¶ 37-43 [DE-1]. In order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must show "1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress." Dickens v. Puryear, 276 S.E.2d 325, 335 (N.C. 1981). It is the Court's opinion that Phifer has failed to forecast evidence sufficient to support this claim, and that it should be dismissed.

It is unnecessary for the Court to determine whether the behavior of any member of the Rocky Mount Police Department rose to the level of extreme or outrageous conduct because

19

Phifer has failed to provide evidence that he suffered severe emotional distress. In North Carolina, severe emotional distress can be established by evidence of:

> Any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.

Waddle v. Sparks, 414 S.E.2d 22, 27 (N.C. 1992).

At his deposition, Phifer stated that he had not seen a psychiatrist, psychologist, psychoanalyst, or therapist of any sort as a result of his time spent employed by the Rocky Mount Police Department. Phifer Depo. at 241:12-15 [DE-33]. Although Phifer stated that the working environment was "uncomfortable," id. at 90:16-20, such a statement is insufficient to support a claim for intentional infliction of emotional distress. Where "[t]here is no forecast of any medical documentation of plaintiff's alleged 'severe emotional distress' nor any other forecast of evidence of 'severe and disabling' psychological problems. . .," a claim for intentional infliction of emotional distress fails. Waddle, 414 S.E.2d at 28. For the foregoing reasons, summary judgment with regard to Phifer's claim for intentional infliction of emotional distress should be granted. See Holloway v. Wachovia Bank & Trust Co., 452 S.E.2d 233, 243 (N.C. 1994) (affirming a grant of summary judgment on a claim for intentional infliction of emotional distress where a plaintiff testified that she had not seen any doctor or sought counseling because of the incident alleged).

D. Tortious Interference with a Prospective Contract Claim

Next, Phifer alleged a claim of tortious interference with a prospective contract based on Chief Manley's statements to officers of the La Grange Police Department that he had reservations about Phifer's honesty and integrity. Compl. ¶¶ 44-49 [DE-1]. An action for tortious interference with prospective economic advantage is based on conduct by the defendants

20

that prevents the plaintiff from entering into a contract with a third party. Owens v. Pepsi Cola Bottling Co., 412 S.E.2d 636, 644 (N.C. 1992). To state a claim for tortious interference with a prospective contract, the plaintiff must allege facts to show that the defendant acted without justification in "inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference." Walker v. Sloan, 529 S.E.2d 236, 242 (N.C. Ct. App. 2000) (citation omitted).

Phifer alleges that he did not receive a job offer from the La Grange Police Department because Chief Manley made statements to the Department implicating his truthfulness and credibility, and that "but for" Chief Manley's statements, he would have been offered the job. Compl. ¶ 46 [DE-1]. Phifer has provided no evidence that he would have obtained employment with the La Grange Police Department but for the statements made by Chief Manley. Regardless of whether Phifer could prove or needs to prove that "but for" Chief Manley's action, he would have a contract with the La Grange Police Department, he has failed to sufficiently allege damages with regard to this claim.

Phifer was "required to assert some measurable damages resulting from defendants' alleged tortious activities, i.e., what 'economic advantage' was lost to plaintiffs as a consequence of defendants' conduct." Walker, 529 S.E.2d at 242. Regarding damages, the Complaint merely states that "Defendants' actions resulted in injury, losses and harm to Plaintiff, for which Plaintiff seeks damages, according to proof." Compl. ¶ 49 [DE-1]. Moreover, the La Grange Police Department disbanded shortly after Phifer applied for a job with the Department. Phifer Depo. at 53:24 [DE-22]. The North Carolina Court of Appeals has held that where it is unclear precisely what damages a plaintiff has suffered, a claim for tortious interference with a prospective contract should be dismissed. Walker, 529 S.E.2d at 242. Dismissal is appropriate

because "[a] defendant is entitled to know from the complaint the character of the injury for which he must answer," and a failure to properly plead damages does not sufficiently alert the defendant of the injury alleged. Thacker v. Ward, 140 S.E.2d 23, 28 (N.C. 1968). Accordingly, it is the Court's opinion that summary judgment should be granted with regard to Phifer's claim for tortious interference with prospective contract.

E. Conclusion

For the reasons provided above, it is the Court's opinion that summary judgment should be granted on all of Phifer's claims against Chief Manley, because those claims are made against Chief Manley in his official capacity. Therefore, those claims are duplicative of the ones that Phifer has asserted against the City of Rocky Mount. Alternatively, it is the Court's opinion that summary judgment on the merits should be granted on all of Phifer's state law claims, including defamation, intentional infliction of emotional distress and tortious interference with a prospective contract.

III.    The City of Rocky Mount's Motion for Summary Judgment [DE-27]

Phifer asserted the same claims against the City of Rocky Mount as he did against Chief Manley, namely defamation, intentional infliction of emotional distress and tortious interference with a prospective contract. Compl. ¶¶ 21-49 [DE-1]. In addition, Phifer asserted a claim against the City of Rocky Mount for employment discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., claiming that he was retaliated against for opposing sex discrimination. Id. ¶¶ 50-56.

A. State Law Claims

The above analysis, supra section II. B.-D., applies to the City of Rocky Mount with regard to the state law claims of defamation, intentional infliction of emotional distress and

tortious interference with a prospective contract. Accordingly, for the reasons specified above, it is the Court's opinion that summary judgment should be granted as to all the state law claims including defamation, intentional infliction of emotional distress and tortious interference with a prospective contract.

## B. Title VII Employment Discrimination Claim

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(10. Moreover, the "opposition clause" of Title VII makes it an unlawful employment practice for an employer to discriminate against an employee because he has "opposed any practice made an unlawful employment practice" within the Title VII statute. Id. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must show the following: (1) that he engaged in protected activity; (2) that the defendant took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the adverse action. Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to show a legitimate, non-retaliatory reason for the action. Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004). If the defendant satisfies its burden, the burden shifts back to the plaintiff to show that the defendant's reasons are pretextual. Id.

      i.    *Prima Facie Case*

          a.  Protected Activity

The Court must first determine whether Phifer has established a prima facie case of retaliation. Accordingly, the Court must consider whether Phifer engaged in a protected activity.

"Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Laughlin v. Metropolitan Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998). The Fourth Circuit has held that an employee's actions are entitled to protection under the opposition clause of Title VII, when the employee complains to his or her employer in an orderly and nondisruptive manner. Id. at 260. For instance, the Fourth Circuit concluded that an employee's actions warranted protection where the employee complained to his human resource manager about the alleged sexual harassment of a subordinate employee at the hands of the head of the branch office. Kubicko v. Ogden Logistics Servs., 181 F.3d 544, 551-52 (4th Cir. 1999) (reversing a lower court decision granting summary judgment and concluding that sufficient evidence was presented to raise a question of fact as to whether the plaintiff was retaliated against for complaining about the sexual harassment of a coworker).

Taking Phifer's statements of the facts as true, as the Court must, Phifer told Chief Manley "if I had have [sic] known that Shirley Moore was going to be taken advantage of in the police department, then I would have never recommended her to the police department." Phifer Depo. at 70:15-18 [DE-33]. This complaint to Chief Manley seems to have been imparted in an orderly and nondisruptive manner, and accordingly, should receive protection under the Title VII opposition clause.

Defendant the City of Rocky Mount argues that Phifer's actions do not deserve protection because his complaint did not take issue with sexual harassment, a protected activity, but rather with an alleged consensual relationship between Chief Manley and Cadet Moore.[1]  City of

---

[1]  Phifer's EEOC Charge was dismissed because Phifer's complaint to Chief Manley about Chief Manley's alleged affair with Cadet Moore was not considered a protected activity. Rocky Mount Mem., Ex. H at 7 [DE-28, Attach. No. 7].

Rocky Mount Opp'n at 24-25 [DE-28]. Phifer did not use the term "sexual harassment" when he complained to Chief Manley. Instead, he said that Cadet Moore was being "taken advantage of." When someone perceives that an individual is being taken advantage of by another, it is reasonable to assume that the person did not think that the relationship was consensual. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 68 (1986) (concluding that "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome").

It is not necessary for a plaintiff to show that that the employer actually violated Title VII, instead, the plaintiff must demonstrate that "he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." Peters v. Jenney, 327 F.3d 307, 320 (4th Cir. 2003) (internal quotations omitted). Accordingly, it is the Court's opinion that Phifer has presented evidence to show that he believed, sufficient for Title VII purposes, that Cadet Moore was the subject of sexual harassment.

### b. Adverse Employment Action

Next, the Court must determine whether Phifer was subject to an adverse employment action. For Title VII purposes, an adverse employment action is one that affects the terms, conditions, or benefits of employment. Munday v. Waste Mgmt. of N. Am. Inc., 126 F.3d 239, 243 (4th Cir. 1997). Conduct that encompasses less than an "ultimate employment decision—to hire, discharge, refuse to promote, etc.—can constitute the necessary adverse employment action [under Title VII]." Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001).

### 1. Resigning from the Rocky Mount Police Department

First, the Court will consider whether Phifer's resignation from the Police Department could be considered an adverse employment action. Phifer signed a letter dated November 17, 2007, resigning from his employment with the Rocky Mount Police Department, and stating that

25

his resignation would become effective two weeks after giving notice, or on December 4, 2007. Phifer's Mem. Ex. 8 at 21 [DE-33, Attach. No. 2]. At the November 21, 2007 Meeting, Chief Manley asked Phifer if he wanted to rescind his resignation, but Phifer declined. Manley Aff. ¶ 14 [DE-23]. At the conclusion of the meeting, Chief Manley decided that it would be unnecessary for Phifer to work out the remainder of his notice, and that the resignation would be effective immediately. Id. ¶ 17. Phifer started working for the Town of Freemont Police Department the next business day following his resignation. Phifer Depo. at 41:24-42:7 [DE-28].

A voluntary resignation is not an adverse employment action. Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 189 (4th Cir. 2004). Moreover, a decision to accept a resignation immediately, and waive a notice period that would have required an employee to work for an additional, limited period of time, does not constitute an adverse employment action. See Wynn v. Paragon Sys., Inc., 301 F. Supp. 2d 1343, 1354 (S.D. Ga. 2004) (noting that an employer's decision not to accept an employee's request that his resignation be effective at a later date does not constitute an adverse employment action).

Phifer argues, however, that he was constructively discharged from his employment with the Rocky Mount Police Department because he complained about the alleged harassment of Cadet Moore by Chief Manley. Phifer's Opp'n at 12-15 [DE-32]. Phifer asserts that he was subjected to a higher level of scrutiny than his coworkers and subjected to numerous disciplinary measures that were unwarranted. Id.

An employee may satisfy the adverse employment action requirement absent a formal discharge, "if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit." Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1353-54 (4th Cir.

26

1995) (internal quotations omitted). In order to prove a constructive discharge claim, a plaintiff must show "(1) deliberateness of the employer's actions and (2) intolerability of the working conditions." Id. (internal quotations omitted). The Fourth Circuit has held that "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004) (internal quotations omitted).

Taking Phifer's allegations as true, the following events occurred during his employment with the Rocky Mount Police Department: (1) he was refused a shift change even though he needed it to take his wife to chemotherapy treatments; (2) he was reprimanded by Lieutenant Mehus for his tone of voice on the radio and for crossing his arms, when other officers acted similarly, but were not reprimand; (3) he was accused by Captain Fahnestock of speeding to work; (4) he was reprimanded for entering a house without backup when his fellow officer should have been reprimanded because the officer had radioed that he was on scene; (5) he was falsely accused by Lieutenant Mehus as being the officer who was speeding at 100 miles per hour on Highway 64; (6) he was falsely accused by Corporal Edwards of speeding on Raleigh Road; and (7) Lieutenant Mehus told him to "shut his damn mouth" during a discussion of one of the speeding incidents.

In order to prove a constructive discharge claim, a plaintiff must provide evidence of truly intolerable working conditions; for instance where a plaintiff testified that his boss and co-workers subjected him to epithets about his Iranian origin almost daily and tried to embarrass him in public, which created such a stressful working environment that the plaintiff suffered from an ulcer and eventually quit, the Fourth Circuit concluded that the plaintiff raised a factual issue about whether his working environment was intolerable. Amirmokri v. Baltimore Gas and

27

Elec. Co., 60 F.3d 1126, 1132 (4th Cir. 1995). However, where an employee alleged that her supervisors yelled at her, told her she was a poor manager, gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back, she failed to show sufficient evidence to support a claim for constructive discharge. Williams, 370 F.3d at 434. Here, the conduct complained of by Phifer, although unpleasant, uncomfortable, and unfair, does not rise to the level of intolerable working conditions necessary to sustain a constructive discharge claim. This is especially true since Phifer stated at his deposition, that the work environment was not "hostile," but rather "uncomfortable," and that he "enjoyed working for Rocky Mount, and if given an opportunity, [he] could work for Rocky Mount tomorrow." Phifer Depo at 90:2-20 [DE-28]. Accordingly, it is the Court's opinion that Phifer has not shown that his decision to leave the employ of the Rocky Mount Police Department constituted an adverse employment action.

## 2. Performance Review and Vacation Pay

Next, the Court will consider whether the City of Rocky Mount Police Department's refusal to provide Phifer with a performance review and vacation pay constituted an adverse employment action. Phifer began his employment with the City of Rocky Mount on November 20, 2006. Henderson Aff. ¶ 4 Ex. B [DE-28]. However, he was not certified as a police officer until February 20, 2007. Id. ¶ 5. His last day of employment with the City of Rocky Mount Police Department was November 21, 2007. The City of Rocky Mount argues that Phifer was not entitled to a performance review and vacation pay because, per departmental policy, he did not complete a year as a certified police officer. Phifer argues that he is entitled to a performance review and vacation pay because he was employed by the City of Rocky Mount

Police Department for more than one year. He further claims that refusing to provide a review and vacation pay constitutes an adverse employment action.

It is the policy of the City of Rocky Mount to require all police officers to serve one year of probationary employment. Id. ¶ 6. The City of Rocky Mount maintains that the year of probationary employment starts when the employee begins work as a police officer. Id. ¶ 7. Phifer asserts that the year of probationary employment begins when hired. The departmental policy provides that "all newly hired and rehired employees appointed to a regular, full-time position shall serve a probationary period following their date of hire or rehire." Id. Ex. A. The policy goes on to state that if the employee is discharged before the probationary period ends, he is not entitled to accrued vacation pay and a performance review. Id.

Denial of a performance review and vacation pay would be considered adverse employment actions, if Phifer were entitled to them. See Cummings v. Lumbee Tribe of North Carolina, 590 F.Supp.2d 769, 773 (E.D.N.C. 2008) (suspension of employee without pay constitutes a material adverse action). However, it is the Court's opinion that Phifer was not eligible for the performance review and vacation pay. Although the wording of the policy says that the probationary period begins after hire, the human resources director attested that it was Rocky Mount Police Department policy to begin the probationary period after the employee began work as a police officer. Henderson Aff. ¶¶ 7-8. Phifer has presented no evidence to the contrary. Moreover, the human resources director stated that the decision not to provide Phifer with vacation pay was hers alone, based on departmental policy. Id. ¶ 9. Accordingly, Phifer has not shown a causal connection between the denial of vacation pay and his allegations of retaliation against Chief Manley.

3. Statements Made by Chief Manley in the F-5B report and to members of the La Grange Police Department

29

Finally, the Court will consider whether Chief Manley's statements in the F-5B report or to the members of the La Grange Police Department constitute an adverse employment action. Title VII's "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006). An employer "can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." Id. at 63 (emphasis in original).

Chief Manley, in the F-5B form stated that Phifer has "issues with integrity, all documented in personnel files. Behavior/conduct in conflict with our policies and departmental core values." Manley Aff. Ex. 7 [DE-23]. In addition, he told officers from the La Grange Police Department that he was concerned about Phifer's truthfulness and integrity. Id. ¶ 26.

A false, negative employment reference could serve as the basis for a retaliation claim. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 178-79 (2d Cir. 2005). The question then, is whether the information provided in the F-5B form or to the officers from the La Grange Police Department could be considered false.

It is the Court's opinion that Phifer has not presented evidence sufficient to raise genuine issues of material fact with relation to whether the statements were true or false. The Court must view the evidence in the light most favorable to Phifer, the nonmoving party. However, "in determining whether a question of fact exists, the trial court must examine all of the evidence and draw all reasonable inferences in favor of the non-moving party." Faircloth, 837 F.Supp. at 125 (emphasis in original). Here, the Court assumes the credibility of Phifer's allegations that he was falsely accused of speeding and insubordination by Lieutenant Mehus, who was acting at Chief Manley's request. However, Phifer has provided no evidence that Captain Fahnestock or

30

Corporal Edwards were similarly manufacturing complaints against Phifer because of his objection to Chief Manley's alleged sexual harassment of Cadet Moore. Moreover, Captain Fahnestock investigated a complaint by Phifer that Lieutenant Mehus cursed at him during a conversation, which was recorded by another member of the Rocky Mount Police Force. She found that Lieutent Mehus did not curse at Phifer; accordingly Phifer was charged with a violation of the policy on truthfulness. Fahnestock Aff. ¶ 20 [DE-24].

Therefore, it is the Court's opinion that Chief Manley's statements in the F-5B form and to the officers of the La Grange Police Department did not constitute an adverse employment action, as there was sufficient evidence provided by other members of the Rocky Mount Police Department to support his statements.

It is the Court's opinion that Phifer has failed to make out a prima face case of retaliation. He was able to show that he engaged in protected activity. However, he was unable to present evidence sufficient to establish that he was subjected to an adverse employment action. As such, his claim for retaliation under Title VII fails.

## CONCLUSION

The Court **RECOMMENDS** that Chief Manley's Motion for Summary Judgment be **GRANTED**, as all claims were alleged against him in his official capacity and are duplicative of those alleged against the City of Rocky Mount, or alternatively, he is entitled to summary judgment on the merits. [DE-21]. The Court further **RECOMMENDS** that the City of Rocky Mount's Motion for Summary Judgment be **GRANTED** with respect to all claims, including the state law claims of defamation, intentional infliction of emotional distress and interference with prospective advantage and the federal Title VII retaliation claim. [DE-27].

31

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 12th day of August, 2010.

DAVID W. DANIEL
United States Magistrate Judge