IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:08-CV-292-FL

| | | |
|---|---|---|
| LAWRENCE EVERETTE PHIFER, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER |
| v. | ) | |
| | ) | |
| CITY OF ROCKY MOUNT; | ) | |
| JOHN MANLEY, CHIEF OF POLICE, | ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the court on defendants' motion for summary judgment (DE # 21, DE # 27), memorandum and recommendation ("M&R") of Magistrate Judge David W. Daniel (DE # 40), and plaintiff's objections to the M&R (DE # 41). Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), United States Magistrate Judge David W. Daniel entered M&R wherein he recommends that the court grant summary judgment as to defendant John Manley as to all claims alleged against him in his official capacity, or in the alternative, grant summary judgment on the merits. Magistrate Judge Daniel also recommended that the court grant summary judgment as to defendant City of Rocky Mount with respect to all claims, including the state law claims of defamation, intentional infliction of emotional distress, and interference with prospective advantage, and the federal Title VII retaliation claim. Plaintiff timely filed objection to M&R, and defendants responded. For the reasons that follow, the court adopts the recommendation of the magistrate judge and GRANTS defendants' motions for summary judgment.

## BACKGROUND

Defendant Rocky Mount police department employed plaintiff as a law enforcement officer. Defendants allegedly retaliated against plaintiff for plaintiff's comments about a disputed affair between the chief of police defendant Manley and another fellow police officer. Plaintiff filed a formal administrative complaint with the Equal Employment Opportunity Commission ("EEOC") and a Notice of Right to Sue letter was mailed to him on April 10, 2008. He filed a complaint in this court on July 2, 2008, asserting against both defendants claims of defamation/libel per se, defamation/slander per se, intentional or reckless infliction of severe emotional distress, and wrongful/intentional interference with prospective advantage. Additionally, plaintiff asserted claims of employment discrimination and/or retaliation against the City of Rocky Mount in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et. seq. Defendant Manley filed his motion for summary judgment on December 11, 2009, and defendant Rocky Mount filed its motion for summary judgment on December 15, 2009. On August 12, 2010, United States Magistrate Judge David W. Daniel entered M&R to which plaintiff filed objections on August 30, 2010.

## STATEMENT OF THE FACTS

The M&R contains an extensive account of the facts underlying this case. They are as follows:

> Phifer began working for the City of Rocky Mount on November 20, 2006. Henderson Aff. 4, Rocky Mount Mem. Ex. B [DE-28, Attach. No.2]. When Phifer started working, the North Carolina Criminal Justice Education and Training Standards Commission had not yet certified him as a police officer, so he was assigned to the administrative unit of the City of Rocky Mount Police Department. Id. On February 20, 2007, he was certified and began working as a police officer in the patrol division. Id. ¶ 5; Fahnestock Aff. 9 [DE-24]. In May 2007, Phifer was assigned to a shift under the command of Lieutenant Tim Mehus. Mehus Aff 6 [DE-25].
>
> During his time employed with the City of Rocky Mount Police Department, Phifer had numerous run-ins with various members of the Department, the details of which are contested. According to Captain Laura Fahnestock, who works for the Rocky Mount Police Department, on July 16, 2007, she was driving to work in her personal

2

vehicle and saw Phifer speed past her in his patrol car and then run through a red light without stopping or slowing down. Fahnestock Aff. 10 [DE-24]. Captain Fahnestock told Lieutenant Mehus about Phifer's driving and directed Lieutenant Mehus to issue an oral reprimand, which he did. Id. ¶ 11. Lieutenant Mehus also issued corrective counseling to Phifer because Lieutenant Mehus thought that Phifer had been disrespectful to him during a shift change. Mehus Aff. ¶ 9 [DE-25]. Phifer denies that he was disrespectful to Lieutenant Mehus. Phifer Depo. at 91: 16-24 [DE-33, Attach. No.3].

At the end of July 2007, Phifer wanted to change shifts. Phifer's Mem. Ex. 3 at 1 [DE-33, Attach. No.2]. Lieutenant Mehus told Phifer that he needed to write down the request and present it to Captain Fahnestock, which Phifer did. Id. On August 2, 2007, Phifer attended a meeting with Captain Fahnestock and Lieutenant Mehus regarding his requested change. Id. He told them that he was having some communication issues with Lieutenant Mehus, that he needed to take his wife to chemotherapy sessions because she had been diagnosed with cancer and that he and his wife were taking classes so that they could adopt a child, which conflicted with his shift time. Id.; Phifer Depo. at 101:18-105:21 [DE-33]. At the time of his request, Phifer was aware that another officer was granted a shift change because he had babysitting conflicts. Phifer Depo. at 115:19-116:1 [DE-33]. Phifer's request was denied. Id. at 102:11.

According to Lieutenant Mehus and Captain Fahnestock, at the August 2 meeting, Phifer stated that he needed to transfer shifts because his wife had cancer and he needed to take her to chemotherapy appointments. Mehus Aff. ¶ 14 [DE-25]; Fahnestock Aff. ¶ 14 [DE-24]. When asked for further details, however, Phifer said that his wife had not yet been to the doctor, had not been diagnosed with cancer and did not have a treatment schedule. Mehus Aff. ¶ 14 [DE-25]; Fahnestock Aff. ¶ 16 [DE-24]. Captain Fahnestock said that she told Phifer that he should put his request to transfer in writing along with information regarding his wife's medical condition as it developed, but he never mentioned the shift change request or his wife's condition agam [sic]. Fahnestock Aff. ¶¶ 17-18.

In August 2007, the City of Rocky Mount Police Department was hiring cadets. Phifer recommended to Chief John Manley that he hire Phifer's neighbor, Shirley Moore. Moore Aff. ¶ 3 [DE-33]. She was hired on August 29, 2007. Id. ¶ 5. Cadet Moore stated that early in her employment Chief Manley made it clear that he possessed the authority and power to impact a cadet's employment and career. Id. ¶ 6. Cadet Moore stated that from September through December 2007, Chief Manley pursued her by continually asking her out to lunch and dinner, calling her on the phone, instructing her to meet him at private places and insisting that she have sex with him. Id. ¶ 9. Cadet Moore told Phifer that she was having sex with Chief Manley. Phifer Depo. at 74: 21-75:17 [DE-33]. In September 2007, Cadet Moore stated that Chief Manley was pressuring her to have lunch with him and she declined; Phifer heard the exchange and told Chief Manley to "back off." Moore Aff. ¶ 8 [DE-33]. In addition, Phifer stated that he told Chief Manley that if he had known Chief Manley was going to try and take advantage of Cadet Moore, he would not have recommended her to the Department. Id.; Phifer Depo. at 70:8-18 [DE-33].

Phifer stated that at some point Cadet Moore told him that she was pregnant. Phifer Depo. at 75:21-76:7 [DE-33]. Phifer felt that Chief Manley was "taking advantage of ...somebody eager to get into law enforcement." Id. at 76:13-15. Cadet Moore stated

3

Chief Manley said "we're going to have to do something about this," when she told him about the pregnancy and gave her money for an abortion. Moore Aff. ¶ 12 [DE-33]. In December 2007, Cadet Moore stated that Chief Manley was very upset because he said that Phifer had sent an anonymous letter to his wife telling her about their affair. Id. ¶ 16. Cadet Moore further stated that Chief Manley said he would get even with Phifer. Id. ¶ 18. Chief Manley denies ever having a sexual relationship with Cadet Moore or interacting with her in any way other than in a professional capacity. Manley Aff. ¶ 30 [DE-23].

On October 8, 2007, Captain Fahnestock issued an oral reprimand to Phifer due to an accident and request for assistance made by Phifer a week earlier. Fahnestock Aff. ¶ 19 [DE-24]. Phifer said that he went into a building in response to a call after hearing that his backup had arrived on the scene. Phifer Depo. at 141:7-13 [DE-33]. Phifer was involved in an altercation with an individual and requested help. Id. In fact, the backup was not on scene, and got into a car accident rushing to Phifer's location. Id. Phifer received a reprimand for the incident, but the officer who got into the car accident did not. Id.

At some point during Phifer's tenure with the Rocky Mount Police Department Lieutenant Mehus pulled Phifer aside at the end of his shift and said "[y]ou're not going to ride that forever. I'm going to get you." Id. at 89:13-14. He said this to Phifer while no one else was around. Id. at 89:20. In addition, at some point Lieutenant Mehus told Phifer that he and Chief Manley were "on the same page." Id. at 121:2-7. Phifer believed that Lieutenant Mehus was always trying to find something wrong with what he did, which made the work environment very stressful and uncomfortable. Id. at 89:19-91:2.

On November 10, 2007, Corporal Matthew Edwards worked on the same shift as Phifer. Edwards Aff. ¶ 5 [DE-26]. On November 12, 2007, Corporal Edwards reported to Lieutenant Mehus that he had seen Phifer driving unsafely during their November 10 shift. Id. ¶¶ 5, 6, & 11. He told Lieutenant Mehus that while responding to a call, Phifer had driven in the oncoming traffic lanes and suddenly turned left in front of Corporal Edwards, requiring Corporal Edwards to slam on his breaks in order to avoid an accident. Id. ¶ 7. In addition, Corporal Edwards stated that Phifer had used his blue lights when responding to a call for property damage, which was unnecessary. Id. ¶ 8. Finally, Corporal Edwards stated that later that night, he was parked at the Piggly Wiggly grocery store in Rocky Mount when he heard a car revving its engine loudly as it approached his location. Id. ¶ 9. He thought that the car was likely speeding, and could have been going as high as 80 miles per hour in a 35 mile per hour zone. Id. Corporal Edwards was preparing to stop the car as soon as it passed him, however when the car drove by, he saw that it was a police car and that Phifer was driving. Id. Phifer stated that he did not see Corporal Edwards when he allegedly cut him off by making a left turn, and that multiple units were responding to the call. Phifer Depo. at 137:20-138:14. In addition, Phifer denies speeding in front of the Piggly Wiggly grocery store on Raleigh Road. Id. at 138:23-139:2. He stated that there was construction on Raleigh Road, and so he could not have been speeding. Phifer Depo.at 121: 12-14 [DE-28]. Lieutenant Mehus issued a reprimand to Phifer for unsafe driving based on these incidents. Rocky Mount Mem. Ex. D [DE-23, Attach. No. 4].

On November 12, 2007, Lieutenant Mehus met with Phifer regarding Phifer's

4

attitude based on the way that Phifer addressed him over the radio. Mehus Aff. ¶ 16 [DE-25]. Lieutenant Mehus explained his concerns and expectations to Phifer. Id. Phifer asserts that he was reprimanded for saying "that's fine" on the radio after Lieutenant Mehus told him not to respond to a fight in progress. Phifer Depo. at 91:16-21 [DE-33]. Phifer stated that officers responded "that's fine" on the radio frequently, but he was singled out and reprimanded. Id.

On November 13, 2007, Lieutenant Mehus received a complaint from Sergeant Scott Pair of the Nash County Sheriffs Department that he had observed a Rocky Mount Police Officer driving at 105 miles per hour in a 65 mile per hour zone on Highway 64 in a patrol car with a "Vista" light bar. Id. ¶ 17. Lieutenant Mehus checked the record logs, and concluded that Phifer was the only officer in that part of Nash County in a marked police car at that time; Phifer had been transporting a prisoner to the detention center. Id. Lieutenant Mehus asked Phifer how he had traveled to the detention center. Id. ¶ 18. Phifer stated that he traveled on Sunset Boulevard and not on Highway 64, and that he had stopped at a Shell Station and purchased a bottle of water from a female clerk. Id.

Lieutenant Mehus checked out Phifer's story by going to the Shell Station. Id. ¶ 19. The clerk who had been on duty during the night in question told Lieutenant Mehus that no police officer had been in to buy water, no female clerk had been on duty, and that a surveillance camera captures vehicles driving on Sunset Avenue. Id. ¶¶ 19-20. Lieutenant Mehus reviewed the surveillance tapes, which did not show a Rocky Mount Police car driving on the road during the relevant time period. Id. ¶ 20.

On November 14, 2007, Lieutenant Mehus talked to Phifer about his visit to the Shell Station and review of the surveillance tapes. Id. ¶ 22. Phifer said that he had made a mistake and had stopped at a different convenience store, known as Valeros. Id. According to Phifer, at this meeting, Lieutenant Mehus cursed at him and told him to "shut [his] damn mouth," said he was a liar, and said that he would be fired and his certification taken. Phifer Depo. at 139: 15-140:11 [DE-33].

After the meeting, Lieutenant Mehus went to Veleros [sic] and talked to the store manager and the clerk who was working on the date in question. Mehus Aff. ¶ 22 [DE-25]. The clerk stated that he had not seen a Rocky Mount Police Officer come into the store that night, but that several days later, an officer had come in and told the clerk that he had bought a bottle of water "last week." Id.

Lieutenant Mehus sustained the allegations against Phifer for reckless driving. Id. ¶ 23. Phifer maintains that he was falsely accused of speeding on Highway 64. Phifer Depo. at 124:19-24 [DE-33]. Each patrol vehicle has a number marked on the side, but Sergeant Pair did not identify the number on the vehicle or the license plate number. Id. at 125: 1-8.

Around November 14, 2007, Chief Manley, who was out of town, received a telephone call advising him that Phifer was upset, and was having conflicts with Lieutenant Mehus. Manley Aff. ¶ 5 [DE-23]. Chief Manley called Phifer and left him messages. Id. ¶ 6. Phifer called Chief Manley back on November 15, 2007, and told him that his wife had cancer, that he was thinking of resigning and wanted to transfer shifts, but that Lieutenant Mehus and Captain Fahnestock had denied his request to change shifts despite his wife's cancer. Id. ¶ 7. Phifer also told Chief Manley that the work environment was becoming intolerable and that Lieutenant

5

Mehus was "harassing him." Id. ¶ 8; Phifer Depo. at 100:6-101:12 [DE-33]. Chief Manley told Phifer to put his concerns in writing and he would review them when he returned. Manley Aff. ¶ 9 [DE-23].

Phifer wrote a letter dated November 16, 2007, to Chief Manley complaining about the harassment that he felt he was facing from Lieutenant Mehus and the fact that his transfer request had been denied. Phifer's Mem., Ex. 3 [DE-33, Attach. No.2]. In addition, Phifer wrote a letter of resignation dated November 16, 2007, to Chief Manley to become effective two weeks later, on December 4, 2007. Id., Ex. 8 [DE-33, Attach. No.2]. In the resignation letter, he stated, "I really want to thank you for standing by me when no one else would." Id. When Chief Manley returned to his office on November 17, 2007, he reviewed these letters. Manley Aff. ¶ 10 [DE-23]. On November 18, 2007, Chief Manley called Phifer and told him not to report for work that day, and Chief Manley told Phifer that he was transferring Phifer to the day shift while Chief Manley reviewed Phifer's complaints. Id. ¶ 11. Phifer declined the shift change because he was not interested in moving to the day shift, rather he had wanted a different night shift that would have worked better for his wife's treatment schedule. Phifer Depo. at 100:20-101:5 [DE-33].

On November 19, 2007, Chief Manley received an investigative package concerning (l) the claim that Phifer was traveling 105 mile per hour on Highway 64 and (2) the internal affairs report by Corporal Edwards that Phifer had been speeding at approximately 80 miles per hour in front of the Piggly Wiggly Grocery Store. Manley Aff. ¶ 12 [DE-23]. He set a meeting with Phifer for November 21, 2007, to discuss the speeding allegations and Phifer's claim of harassment. Id.

Chief Manley, Captain Fahnestock, Lieutenant Mehus, and Phifer attended the November 21, 2007 meeting. Manley Aff. ¶¶ 13-14 [DE-23]; Fahnestock Aff. ¶ 22 [DE-24]; Mehus Aff. ¶ 31 [DE-25]. At the meeting, Chief Manley asked Phifer if he wanted to rescind his resignation but Phifer declined. Manley Aff. ¶ 14 [DE-23]. Phifer stated that Lieutenant Mehus had used profanity towards him during a meeting discussing the allegations of Phifer's speeding. Id. Lieutenant Mehus denied that he cursed at Phifer, but noted that he had recently learned that another officer that was present had tape recorded his conversation with Phifer. Manley Aff. ¶ 14 [DE-23]; Mehus Aff. ¶ 30 [DE-25]. Chief Manley told Captain Fahnestock to undertake an internal affairs investigation into whether Lieutenant Mehus had cursed at Phifer. Manley Aff. ¶ 14 [DE-23]. Chief Manley asked Phifer about the allegations of speeding on Highway 64, and Phifer denied that he had driven on the Highway 64 and that he had been speeding. Id. ¶ 15. During the meeting, Chief Manley also asked Captain Fahnestock about Phifer's claim that she had denied his request for a transfer even though he needed to change his work schedule due to the fact that his wife had cancer and needed treatments. Id. ¶ 16. Captain Fahnestock denied that Phifer had needed a transfer due to his wife's cancer because Phifer had said that his wife had not even been to the doctor. Id.

After hearing from Phifer, Captain Fahnestock, Lieutenant Mehus and reviewing the internal affairs investigations regarding Phifer's alleged speeding, Captain Manley told Phifer that it would not be necessary for him to work the additional two weeks, that his resignation was effective immediately, and that he should turn in his badge and gun, which Phifer did. Id. ¶ 17. After the meeting, Captain Fahnestock listened to the tape

6

recording of Phifer's conversation with Lieutenant Mehus regarding the speeding allegation. Fahnestock Aff. ¶ 20 [DE-24]. She concluded that Lieutenant Mehus had said "Phifer, Phifer, Phifer; Shut yourmouth," but had not used profanity. Manley Aff. Ex. E at 5 [DE-23, Attach. No.5]. Phifer was charged with a violation of the policy on truthfulness and Lieutenant Mehus was cleared of the allegation that he used profanity. Fahnestock Aff. ¶ 20 [DE-24]; Manley Aff. ¶ 14 & Ex. E [DE-23, Attach. No.5].

      Phifer had applied for and obtained a job with the Town of Freemont [sic] Police Department before his resignation from the City of Rocky Mount Police Department. Phifer Depo. at 47:22-48:18 [DE-22]. He started working for the Town of Freemont [sic] the next business day after leaving the employ of the City of Rocky Mount. Id. at 13:7-13.

      Phifer applied for a job with the police department for the Town of La Grange, North Carolina after he left the employment of the City of Rocky Mount and had begun working for the Town of Freemont. [sic] Id. at 52:22-53:24. As part of the employment vetting process, officers from the Town of La Grange contacted Chief Manley regarding Phifer and provided Chief Manley with a release authorization signed by Phifer. Manley Depo. ¶ 24-25 [DE-23]. The officers asked Chief Manley about his impressions of Phifer, and Chief Manley told the officers that he was concerned about Phifer's truthfulness and integrity. Id. ¶ 26. Phifer was not hired for the Town of La Grange position. Phifer's Mem., Ex. 11 [DE-33, Attach. No.2].

(DE # 40, M&R 2-10).

## DISCUSSION

A.      Standard of Review

A court should grant a summary judgment motion pursuant to Rule 56 of the Federal Rules of Civil Procedure when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). As this court has stated, summary judgment

is not a vehicle for the court to resolve disputed factual issues. Faircloth v. United States, 837 F. Supp. 123, 125 (E.D.N.C. June 29, 1993). Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249.

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. Faircloth, 837 F. Supp. at 125.

The district court reviews *de novo* those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a *de novo* review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir.1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(c).

B. Plaintiff's Objections to the M&R

1. Official/Individual Capacity Claims Regarding Defendant Manley

Plaintiff objects to the M&R finding regarding the nature of plaintiff's claims against defendant Manley. The magistrate judge considered plaintiff's complaint as well as memorandum

8

in opposition to defendants' motion for summary judgment and found that plaintiff asserted claims against defendant Manley in his official, not individual capacity. In Mullis v. Sechrest, the North Carolina Supreme Court found that a plaintiff who failed to specify whether the defendant was being sued in an official or individual capacity was suing in an official capacity. 347 N.C. 548, 551-52, 495 S.E.2d 721, 723 (1998). "[I]t is not often clear in which capacity the plaintiff seeks to sue the defendant. In such cases it is appropriate for the court to either look to the allegations contained the complaint to determine the plaintiff's intentions or assume that the plaintiff meant to bring the action against the defendant in his or her official capacity." Mullis, 347 N.C. at 552, 495 S.E.2d at 723. In determining that the plaintiff was suing the defendant in his official capacity, the Mullis court considered the language of the plaintiff's complaint, which alleged that the defendant was an agent of the co-defendant school board. In the absence of a clear designation of whether the defendant was being sued in his personal or official capacity, the Mullis court interpreted this allegation to mean that the defendant was being sued as an agent of the school board, and thus in his official capacity.

In the present case, plaintiff failed to specify in his complaint whether he was suing defendant Manley in an individual or official capacity. After defendant Manley raised the defense of government immunity in his answer, plaintiff did not amend his complaint to designate in what capacity he was suing Manley. Plaintiff's complaint alleges that "Defendant John Manley is . . . an authorized agent acting on behalf of City of Rocky Mount as Chief of Police." Compl. ¶ 3. This designation suggests that plaintiff is suing defendant Manley in his official capacity pursuant to his actions as an agent for the police department. Another factor that indicates plaintiff is suing defendant Manley in his official capacity is that plaintiff does not set forth claims for relief against

9

defendant Manley separately, but rather states his claims collectively against defendants Manley and City of Rocky Mount. Additionally,

> [i]f plaintiff seeks an injunction requiring the defendant to take an action involving the exercise of a governmental power, the defendant is named in an official capacity. If money damages are sought, the court must ascertain whether the complaint indicates that the damages are sought from the government or from the pocket of the individual defendant.

Meyer v. Walls, 347 N.C. 97, 110, 489 S.E.2d 880, 887 (1997). Plaintiff seeks both an injunction and "economic damages according to proof" from defendants. Compl. ¶ 11. While the demand for economic damages can be indicative of an individual capacity claim, plaintiff's demand does not reflect a desire to recover from defendant Manley's pockets. Viewed as a whole, plaintiff's claims against defendant Manley are not sufficient to support a conclusion that plaintiff sued defendant Manley in his personal capacity.

An official capacity suit is "'another way of pleading an action against an entity of which an officer is an agent.'" Moore v. City of Creedmoor, 345 N.C. 356, 367, 481 S.E.2d 14, 21 (1997) (quoting Kentucky v. Graham, 473 U.S. 159 (1985)). "Thus, where the governmental entity may be held liable for damages resulting from its official policy, a suit naming public officers in their official capacity is redundant." Id. Plaintiff argues that Moore is restricted to Section 1983 claims. There is no language in that opinion that restricts the holding regarding official capacity claims to Section 1983 claims. Furthermore, the North Carolina Supreme Court adopted the reasoning from Moore in Mullis, a suit involving a personal injury action, not a Section 1983 claim. "As we have previously noted, official-capacity suits are merely another way of pleading an action against the governmental entity." Mullis, 347, N.C. at 554-55, 495 S.E.2d at 725. Accordingly, the court adopts the magistrate judge's finding that plaintiff's claims against defendant Manley were identical to his claims against defendant City of Rocky Mount.

10

Plaintiff relies on Beck v. City of Durham, 154 N.C. App. 221, 230, 573 S.E.2d 183, 190 (2002) which states that while public officials are shielded from liability in their official capacities, they remain "personally liable for any actions which may have been corrupt, malicious, or perpetrated outside and beyond the scope of official duties." Id. The magistrate judge, however, considered this theory of liability and found that while plaintiff's claims against defendant Manley should be dismissed because plaintiff sued Manley in his official capacity, in the alternative, summary judgment should be granted for defendant Manley on the merits because plaintiff did not present an issue of material fact to support recovery on state law claims. (M&R 22). The court will address plaintiff's objections to the M&R regarding the state law claims in turn.

2. Defamation Claims Against Defendants Manley and City of Rocky Mount

Plaintiff objects to the magistrate judge's findings that the statements made by Chief Manley in the Form F5-B Report and to the officers of the La Grange Police Department did not show by clear and convincing evidence the actual malice required for a defamation claim against a public official. "Summary judgment is . . . appropriate in [a defamation action] . . . where plaintiff, who, assuming the burden of production to negate defendant's presumption of good faith with evidence of actual malice, sets forth no specific fact showing an issue as to defendant's motive, but rests upon bare allegation and suspicion." Dobson v. Harris, 352 N.C. 77, 87, 530 S.E.2d 829, 837 (2000). Since plaintiff was a police officer at the time the statements were made, and the statements were made to other public officials in the Rocky Mount and La Grange police departments regarding plaintiff's fitness for the job, he is considered a public official for the purposes of a defamation claim. Smith v. McDonald, 562 F.Supp. 829, 834 (M.D.N.C. 1983) (citing Dellinger v. Belk, 238 S.E.2d 788, 789 (N.C. Ct. App. 1977) (holding a police officer to be a public officer for a

11

defamation claim)). The plaintiff can only recover if he can prove the malicious intent of the defendant and the falsity of the statements. Id. at 835. In defamation actions brought by public officials, plaintiff must prove that defendant published the defamatory statement with actual malice. New York Times v. Sullivan, 376 U.S. 254, 279-80 (1964). The "actual malice" standard requires "clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." Gaunt v. Pittaway, 139 N.C. App. 778, 785, 534 S.E.2d 660, 665 (2000) (citing New York Times, 376 U.S. at 342).

In this case, plaintiff has failed to show with clear and convincing proof that the defamatory statement was made with knowledge of its falsity or reckless disregard for the truth. Taking the facts plaintiff alleged as true, defendant Manley's statements on plaintiff's F5-B report and to the La Grange police department were motivated by a desire to "get even" at plaintiff for plaintiff's actions regarding defendant Manley's alleged affair. (DE # 33, Moore Aff. at 4). Additionally, Lieutenant Mehus dishonestly accused plaintiff of speeding and helped defendant Manley defame plaintiff. Two other members of the Rocky Mount police department, however, provided affidavits describing instances in which they saw plaintiff speeding that suggest defendant Manley had reasonable grounds upon which to doubt plaintiff's truthfulness. Additionally, Captain Fahnestock stated that she investigated plaintiff's allegations that Lieutenant Mehus cursed at plaintiff and found the allegations to be untrue. Plaintiff did not allege that Captain Fahnestock and Corporal Edwards were influenced by the same motives that he alleges influenced defendant Manley and Lieutenant Mehus. While plaintiff did offer the affidavit of Shirley Moore who said that defendant Manley threatened to get even with the plaintiff, the affidavits of Fahnestock and Edwards prevent the plaintiff from meeting the "clear and convincing" standard that defendant Manley made statements

12

about plaintiff knowing they were false or in reckless disregard for the truth. Accordingly, plaintiff's defamation claim against defendant Manley and the City of Rocky Mount fails.

  3. Interference with Prospective Contract Claims Against Defendants Manley and City of Rocky Mount

  Plaintiff objects to the magistrate judge's finding that plaintiff failed to plead sufficient damages to satisfy the requirements of an interference with prospective contract claim. The magistrate judge analyzed this claim under a tortious interference with contract standard. The plaintiff did not allege tortious interference with contract, but rather intentional interference with prospective advantage. See Compl. ¶ 8 (alleging "Wrongful/Intention Interference with Prospective Advantage" against all defendants). Regardless of the magistrate judge's application of the legal standard, summary judgment is proper for defendants as to this claim.

  "[I]t is generally held that to interfere with a man's business, trade or occupation by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, is actionable if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights, but with a malicious design to injure the third person or gain some advantage at his expense." Spartan Equip. Co. v. Air Placement Equip. Co., 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965). Plaintiff must show that he would have gotten the job with the La Grange police department but for defendants's statements about him and also that he suffered damages.

  Plaintiff has not shown any damage from not receiving the job with the La Grange police department. The department disbanded shortly after plaintiff applied for the job. Furthermore, plaintiff went to work for the Fremont Police Department immediately after he left the Rocky Mount

13

Police Department. (DE # 33, App. 3, p. 51). In his deposition, plaintiff noted that at the meeting with defendant Manley regarding plaintiff's employment with the Rocky Mountain Police Department, he told defendant Manley that he was "out" because he had already gotten a text message confirming new employment and his new employer wanted to know when he could begin. Id. While plaintiff did say that there were more advancement opportunities at La Grange, plaintiff himself acknowledged that La Grange is no longer in existence, so advancement at La Grange would not have been a possibility. Furthermore, the only damages that plaintiff alleged in the complaint were "injury, losses and harm to Plaintiff, for which Plaintiff seeks damages." Compl. ¶ 9. Since plaintiff was employed immediately after leaving the Rocky Mount police department, and would not have had the opportunity to advance at La Grange Police Department, he has not sufficiently shown damages required for an interference with prospective economic advantage claim. Accordingly, the court grants summary judgment for defendants as to this claim.

4. Title VII Claims Against Defendant City of Rocky Mount

Plaintiff objects to the magistrate judge's findings that plaintiff does not establish a *prima facie* case of unlawful employment practice under Title VII. Title VII makes it an "unlawful employment practice for an employer . . . to discriminate with respect to . . . compensation, terms, conditions, or privileges of employment, because such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(10). Title VII also makes it an unlawful employment practice for an employer to discriminate against an employee because he has opposed any practice made an unlawful employment practice within the Title VII statute. Id. § 2000e-3(a). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show the following: (1) that he engaged in protected activity; (2) that the defendant took an adverse employment action against him;

14

and (3) that a causal connection existed between the protected activity and the adverse action. Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). The magistrate judge found plaintiff's comments to defendant Manley about the alleged affair between Manley and Cadet Moore to be protected activity, but found that plaintiff did not sufficiently allege adverse employment action and a causal connection between the protected activity and adverse action.

a. Intolerable Working Conditions

Plaintiff objects to the magistrate judge's findings that plaintiff did not present evidence of intolerable working conditions sufficient to prove constructive discharge under Title VII, 42 U.S.C. § 2000e-2(a)(10). It is established that an employee is entitled to relief under Title VII even absent a formal discharge if an employer makes an employee's working conditions intolerable as to induce the employee to quit. Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1353-54 (4th. Cir. 1995) (internal quotations omitted). To demonstrate constructive discharge, a plaintiff must allege and prove two elements: (1) "deliberateness of the employer's actions" and (2) "intolerability of the working conditions." Id. (internal quotations omitted). Courts have found intolerable working conditions when employees are repeatedly subject to insults about their race or national origin. Amimokri v. Baltimore Gas and Elec. Co., 60 F.3d 1126, 1132 (4th Cir. 1995) (finding intolerable working conditions when co-workers daily subject employee to epithets about his national origin); Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 671, 677 (7th Cir. 1993) (finding intolerable working conditions when employee was subject to "racist comments and taunts"). However, "'[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.'" Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th. Cir. 2004) (quoting Carter v. Ball,

15

33 F.3d 450, 459 (4th Cir. 1994)) (dismissing employee's Title VII constructive discharge claims when supervisors yelled at her, she was given poor evaluations, chastised in front of customers, and required to work with an injured back). "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir.), cert. denied, 519 U.S. 818, 117 S.Ct. 70 (1996). Rather, the purpose of Title VII is to protect a reasonable person from a work environment in which abuse is sufficiently "severe or pervasive as to alter the conditions of his or her employment." Buckner v. Gen. Signal Tech. Corp., 163 F.Supp.2d 617, 624 (W.D.N.C. June 13, 2000) (quoting Hopkins, 77 F.3d at 753).

Accepting plaintiff's allegations as true, and assessing the facts in the light most favorable to plaintiff, the following is a list of incidents that plaintiff experienced while working at the Rocky Mount Police Department: plaintiff was refused a shift change after requesting one in order to take adoption classes and accomodate his wife's chemotherapy schedule; plaintiff was reprimanded for his body language and manner of speaking to Lieutenant Mehus; plaintiff was falsely accused by colleagues of speeding to work and improper driving; plaintiff was reprimanded for entering a house without backup when another officer falsely radioed that he was on the scene with plaintiff; and Lieutenant Mehus told plaintiff to "shut his damn mouth" in a discussion. While these incidents are uncomfortable and unpleasant, taken as a whole they do not rise to the level of being intolerable, which is what is required in a Title VII claim. Furthermore, plaintiff described his working conditions as not hostile, but uncomfortable. (DE # 33, App. 3, p. 12). Plaintiff's characterization of his working conditions as merely uncomfortable supports the finding that he has not alleged intolerable working conditions. Accordingly, plaintiff has not shown that his decision to leave the Rocky Mount Police Department constituted an adverse employment action under Title VII.

16

b. Adverse Employment Action

Plaintiff objects to the magistrate judge's finding that plaintiff was not eligible for a performance review and vacation pay and thus did not present evidence that he suffered an adverse employment action under Title VII. An adverse employment action is a discriminatory act which "adversely affects[s] 'the terms, conditions, or benefits' of the plaintiff's employment." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (citations omitted). "Conduct short of 'ultimate employment decisions' can constitute adverse employment action." Id. (citations omitted). Thus, denial of a performance review and vacation pay would be considered adverse employment actions under the statute.

The magistrate judge found that plaintiff was not yet eligible for a performance review and vacation pay. Plaintiff acknowledges that he was subject to a year-long probationary period after he began work, but argues that his probationary period began on November 20, 2006, and thus that he was entitled to these benefits beginning November 20, 2007, before he left the police department. Defendant argues that plaintiff's probationary period did not begin until February 20, 2007 because he was not yet certified as a police officer by the North Carolina Criminal Justice Education and Training Standards Commission. Plaintiff did not become certified as a police officer until February 20, 2007 because the Commission was investigating an incident of disorderly conduct involving plaintiff that occurred in New Jersey. Plaintiff acknowledges that he was not certified until the incident was resolved in February of 2007. (DE # 33 Att. 3, p. 36). Although plaintiff's confirmation of an offer of employment from Rocky Mount Police Department stated that his probationary period of employment began on November 20, 2006, it was department policy that plaintiff not be considered a full police officer until he was certified in February 2007. The Human Resources

17

Director for the City of Rocky Mount who denied plaintiff's request for vacation pay and performance review did so in light of her interpretation regarding plaintiff's probationary status. (DE # 28 Henderson Aff. 4 Ex. B). While plaintiff has alleged actions that would rise to the level of an adverse employment action, plaintiff has not shown the causal connection between his protected activity and the adverse employment action. Rocky Mount Police Department policy dictates that plaintiff did not become eligible for his benefits until February of 2008, and it was departmental policy alone that determined this result. Accordingly, plaintiff failed to make out a *prima facie* case of retaliation as to the denial of vacation pay and a performance review because such denial did not constitute an adverse employment action under Title VII.

Additionally, plaintiff objects to the magistrate judge's finding that the statements made by defendant Manley on the F-5B report and to the La Grange police department were not adverse employment actions. The scope of the Title VII antiretaliation provision extends beyond only workplace or employment-related retaliatory acts and harm. Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 65 (2006). "An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." Id. at 63. The Second Circuit has held that a false, negative employment reference could constitute an adverse employment action under the antiretaliation provision of Title VII. See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 178-79 (2d. Cir. 2005).

The magistrate judge found that plaintiff did not present evidence sufficient to raise a genuine issue of material fact with relation to whether the statements defendant Manley made were false. While the court must view the evidence in the light most favorable to plaintiff, "in determining whether a question of fact exists, the trial court must examine all of the evidence and

18

draw all *reasonable* inferences in favor of the non-moving party." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985), abrogated on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228, 238 (1989). Even taking plaintiff's allegations regarding defendant Manley's motives and Lieutenant Mehus's support of defendant Manley as true, plaintiff fails to present evidence suggesting that Captain Fahnestock or Corporal Edwards were falsely manufacturing complaints regarding plaintiff's driving, or that Captain Fahnestock was untruthful regarding her investigation into Lieutenant Mehus's alleged swearing at plaintiff.

In his objections, plaintiff specifically objects to the court's consideration of Captain Fahnestock's investigation into Lieutenant Mehus's alleged swearing at plaintiff. The conversation in which Lieutenant Mehus allegedly cursed at plaintiff was recorded. Captain Fahnestock stated in her affidavit that she listened to the recording and Lieutenant Mehus did not swear. The recording is not part of the record. Plaintiff argues that to consider this evidence as a basis upon which defendant Manley might have doubted plaintiff's truthfulness is to rely on hearsay. Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). A "declarant" is a person who makes a statement, and a statement is "an oral or written assertion or . . . nonverbal conduct of a person, if it is intended by the person as an assertion." Fed. R. Evid. (a), (c). Here, the "statement" being offered for its truth is not Lieutenant Mehus's statement, but rather the statement of Captain Fahnestock who stated in an affidavit what she heard when she listened to the recording. The court is not required to listen to the recording in order to consider Captain Fahnestock's affidavit. Cf. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 521 (1991) (refusing respondents' request that court listen to tape-recorded statements at summary judgment stage

19

because petitioner provided affidavit that he did not make such statements). Moreover, the tape recording itself is not part of the record, and plaintiff did not specifically request it. In its memorandum opposing summary judgment, plaintiff acknowledges that the recording may not contain the cursing and makes no demand that defendants provide the recording for consideration. Even considering the facts in the light most favorable to the plaintiff, the court finds that there is still sufficient evidence to support an alternative basis for defendant Manley's statements regarding plaintiff's truthfulness in the F-5B report and to the La Grange police department other than a mere desire to harm plaintiff. Accordingly, plaintiff fails to show that defendant Manley's statements were an adverse employment action and fails to make out a *prima facie* case of retaliation.

## CONCLUSION

Upon *de novo* review of those portions of the magistrate judge's M&R to which specific objections have been filed, and upon considered review of those portions of the M&R to which no such objection has been made, the court ADOPTS the findings and recommendations of the magistrate judge in full, and GRANTS summary judgment for defendants. The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 28th day of September, 2010.

_____
LOUISE W. FLANAGAN
Chief United States District Judge

20

Case 5:08-cv-00292-FL   Document 45   Filed 09/28/10   Page 20 of 20